We'll now proceed to the last case on this afternoon's oral argument calendar, which is Planet Aid v. Reveal. May it please the Court, my name is Sam Rosenthal. I represent the Planet Aid charity and Elizabeth Thompson, who worked for DAP Malawi, a subcontractor to Planet Aid. I'd like to reserve five minutes for rebuttal. We're here because the defendants wrote a series of 18 articles, including podcasts, hundreds of social media messages, accusing the plaintiffs of stealing money meant for the poor in Africa, of cheating farmers out of equipment paid for by the USDA, extorting money from employees, and siphoning 50 to 70 percent, or over $130 million, from the USDA. The district court found that the plaintiffs could sustain their burden at this juncture, proving all of those statements are false, but dismissed the case anyway. The court made two fundamental errors, the district court. First, it found that both the plaintiffs were limited-purpose public figures. They are not, and I'll address that in my argument. Second, it found that under the malice standard, malice could not be shown, and here there was ample evidence. And we'll show there's at least 12 sources which the defendants say they relied upon who came forward and said, either I never made the statements they say I said, or they made statements that the defendants misreported in the articles, or the defendants relied on facts which are undisputed in the record or contrary to what was published. Undisputed facts that are based on the record, citations, and I'll get to those. There are six examples. And finally, there's one example I'll give where they admitted they had no evidence whatsoever to support one of the main themes in the case. I'd like to address any questions from the court, but if the court has no questions at this juncture, I'd like to move to the first issue. Make off, set forth a three-part test, and I'd like to focus on the second prong of that test, whether or not the defendants voluntarily thrust themselves to the forefront of a pre-existing particular controversy. They fail on all grounds. There was no pre-existing controversy. The defendant said they were writing about the USDA program. There was nothing thrusting either plaintiff to the forefront of any controversy at all. They gave no press conferences, unlike Mrs. Firestone in the Firestone case. There were no press conferences, no TV appearances. There were no ads disputing anything which could be considered a controversy in this case. What they rely upon are facts similar to, for example, well, Elizabeth did attend high school graduations in which she spoke for five minutes congratulating the students matriculating, or they say that the plaintiffs had, for example, engaged in fundraising. There are three buckets of facts that they rely upon. None of them are adequate. The first bucket are statements actually which show the plaintiffs shying away from publicity, trying to avoid litigating the issue in the press. One of the articles that they rely upon, and presumably one of their strongest pieces of evidence, is an article of 3560 of the record where they say Planet Aid refused an on-camera interview. That is not what you do when you're trying to thrust yourself to the forefront of a controversy. The same is true of an article that they rely upon, which they put in the record at 4009, in which you have Ms. Thompson unavailable for comment, not what you do if you're trying to get to the forefront of the controversy in order to affect the outcome. As I said, none of the conduct that they pointed to are tantamount to meeting the second prong. The second bucket are statements where you've got some kind of a mere denial. For example, they say there was a controversy about an individual in Denmark who was acquitted of embezzlement and tax evasion. And they say, well, that's the controversy, and the plaintiffs responded to that controversy. Not true. All you have are statements by either Planet Aid or Thompson, as one article put it, distancing herself, Thompson, from this individual in Denmark who was acquitted of charges. Both the Supreme Court of California in Kawar, the Second Circuit in La Liberté, and other cases from this court have held when you step forward simply to defend your reputation, that is not meeting the second prong. Making a curt statement, a cursory statement, simply denying an allegation is not thrusting oneself to the forefront of a controversy. And the final area has to do with what the Supreme Court said in Firestone are trivial or tangential participation in a controversy and said that is not enough. As I said, here there is no controversy, but what do they rely upon? The biggest fact they have are fundraising. Well, the way Planet Aid engages in fundraising is by asking people to donate their used or discarded clothing so it could be sold and money donated to charitable purposes. It's a complete disconnect. It's illogical. It makes no sense to say when Planet Aid told people, donate your used clothing, they were also saying, and we didn't steal money from the USDA, meant from Mozambique and Malawi. If the defendants are correct that in this case the plaintiffs meet the second prong, then certainly the Supreme Court's decisions in Walston, in Hutchinson, in Firestone, and this court's decision in Trump University are all wrongly decided. Because in this case, all you have is the allegation that association with someone who is in controversy, who is in a controversy, is enough. That's not the law. If Donald Trump, whose name is on Trump University, was not a limited purpose public figure by virtue of his association, then clearly more has to be met. And clearly in this case there was none. I'd like to go to the issue of malice, unless the court has any questions. With respect to malice, the test is set forth very clearly in Kalin versus Globe. They rely on it. We rely on it. The test is, could a reasonable juror, might a reasonable juror, find in favor of the plaintiffs? And in looking at that issue, all credibility determinations go to the non-movement. That's the plaintiffs. All disputed issues of fact go to the non-movement. That's the plaintiffs. All inferences are drawn in favor of the plaintiffs. And in this case, we have 12 sources, they say, they say, they relied upon who came forward and submitted declarations. And they say, we did not say, we did not make statements, they say we made, or alternatively, we told the defendants things that were contrary to what they published. Twelve of their sources came forward and supported our motion, or our opposition to the motion. It's not enough for the defendants to say, but we have other evidence. That's not the test, because the jury has to weigh the declarations we submitted and make a determination as to whether or not those prevail, and whether or not a jury might, and that's the test of this court, might favor the declarations we submitted over the ones they submitted. There are also examples in the record, not just of their sources who came forward and said, the stories are false, they made it up, that's what a jury could find, they made it up, they lied. But there's also examples in the record where they were told facts that were contrary to what they published. And I'd like to give six examples. There are more, but I'd like to give six examples. One is they said, farmers were cheated because they didn't get 25 pumps, 25 pumps per village or club. They made that statement at 5,095 of the record. Days after making that statement in a published article, Ms. Walters gave an interview in which she said, well, I don't know what our source was relying on, because they were only supposed to get one. And her statement appears at page 5,228. That's exactly what Flowers v. Carville deals with. When you know what you're publishing is false, you can't come in and say, but someone told me facts, even though I know it was false, I went with the false facts. Another allegation was that they only got one pump for free in the village of Nijuli in Malawi. Oddly enough, both Ms. Walters and Mr. Smith said, well, we were told they got seven. Why does it matter whether they got one or two or seven? Because seven exceeded the number of pumps, the undisputed testimony, the number of pumps each village or farmers club was entitled to receive. And so if they got seven, the farmers weren't cheated, they actually got more than they They said the chief had to pay $100 for a pump, and he could have sent his daughter to school for a year. Well, Ms. Walters interviewed the chief, and she was told at page 394 in black and white in the record, of course he didn't pay. That's her interview with the chief. Of course he didn't pay. They nevertheless wrote he paid $100. Did he pay anything? Well, he made it clear. He said at page 394, any money stayed in the community, it didn't go to DAP. And he said that and he repeated it. One of the other statements they made was it was a lie. Every farmer said it was a lie to say they benefited from the program. Every farmer. In fact, every farmer they interviewed submitted a declaration saying that they did benefit. Every single farmer that they were relying upon as sources submitted a declaration opposing the motion. Not only did they say they benefited, they said we didn't pay for pumps, we didn't pay for animals, we didn't get just one goat or one pig which died. Fact after fact, they refuted. And these were their sources. And so a jury is entitled to look at that evidence, and might they decide in favor of the plaintiffs? As long as that might exist, we were entitled to have the motion denied, I would submit. It's more than a might. In this case, it's a would. They also said, excuse me, they said that they had talked to someone named Johnny Camwendo and he said his village had only gotten one goat and one pig. And his declaration that appears at page 3313, he told them he had nothing to do with the He wasn't a part of it, and as far as he knew, neither was his village. But I wanted to give you an example also where the defendants admitted flat out they published a statement and they knew they had no basis whatsoever, nothing to support it. And that is two-thirds of the money that was supposedly siphoned away was supposed to go to Mozambique. They said at 3899, the money was meant to help with food, health care, and education in Malawi and Mozambique, referring specifically to the 130 million. That's why one of the senior editors at page 1842 said it was an important part of the story, an important part of the story, that money was misused in Mozambique and Malawi. And this is the testimony, and I use it only because it's emblematic of the testimony by both reporters and all four fact-checkers. I refer to Ms. Pyle's testimony at page 539, 543. As you sit here today, can you tell me how much money was siphoned away, stolen, or diverted from the program in Mozambique? Answer, no, I cannot. Can you tell me anything about the program in Mozambique? No, I cannot. And again, I use that not because it's the only example or even the strongest, but because it's emblematic of the testimony by every editor who was fact-checking the stories and by both reporters. No one had any evidence whatsoever. And the last point I'd like to make is that this is a case in which, under King and Hart-Hanke, there was a conscious, deliberate decision to avoid those who were most knowledgeable. Of course, in Hart-Hanke, it would be enough if they simply had equal access to the facts, but here they were most knowledgeable. The defendants published that every accountant they interviewed told them that fraudulent invoices were used. They interviewed three accountants. One was Emmanuel Pirie, who told them he wasn't going to help them, he wasn't going to provide the information they were looking for, and they stopped calling him, but not until after they tried to bribe him. A second accountant they interviewed was Mary Boccozzi. She told Nwira, their agent and investigator in Malawi, that she didn't know of anything that was fraudulent. She was the second accountant. The third accountant was an individual named Longway. They described him as problematic and guessing, and when I asked them, well, what changed your mind, and why did you rely upon him in the articles after you said he was problematic and guessing, and they said they didn't know, and I referred their testimony at 1968-69 at the record, and also 1660. So based on three accountants, two who flatly refused to provide the information or disputed it, one who was problematic and guessing, what did the defendants do? They ignore three accountants who had the most direct knowledge, Bruce Peary, the accountant at DATM Malawi, Tom Meehan, the CFO at PlanetAid, and the outside accountant who was responsible for the audited financial statements, which of course were in their possession and definitively disproved the allegations. So this is a case which is not in the margins. It's one where we're relying on Hornbook law, the heartland of defamation cases, and most importantly the heartland of Rule 56 cases that say if there's a disputed issue of fact, we're entitled to prevail on the motion. The disputed issues of fact are all over the record, and I reserve my time for rebuttal. But the issue of fact not only has to be disputed, but has to provide, as I understand it, clear  Is it your position that it does? Oh, my position is it provides more than clear and convincing evidence, but that's not the standard at this juncture. It's simply whether a juror might find clear and convincing evidence at trial. And that distinction, I believe, is really quite important because in this case, as long as there are disputed issues of fact from which relate to that issue, we're entitled to prevail. What could be stronger evidence of disputed issues of fact than their sources coming in and saying, basically, that they lied in the story? Thank you, counsel. Thank you. I reserve the rest of my time for rebuttal. Thomas Burke of Davis Wright Tremaine, appearing on behalf of Reveal from the Center for Investigative Reporting and reporters Matt Smith and Amy Walters. I will refer to my clients collectively as CIR or Reveal. For 18 months, CIR and its experienced reporters investigated plaintiffs. CIR painstakingly fact-checked every statement and thoroughly reviewed and edited all of the publications that issue in this appeal. This is not a hit job. Plaintiffs repeatedly declined to be interviewed or answer questions during CIR's investigation. CIR conducted interviews with over 200 people on three continents, including credible witnesses with direct knowledge of plaintiffs' activities in Malawi and who shared information with CIR at great personal risk of retaliation. CIR traveled to Malawi to visit farms that plaintiffs had identified as benefiting from plaintiffs' work. After CIR filed its anti-slap motion for two years, PlanetAid engaged in scorched earth discovery. Plaintiffs deposed and cross-examined every editorial employee who was involved in CIR's reporting. Through discovery, CIR produced to plaintiffs more than 90,000 documents and over 80 hours of audiovisual files. CIR produced the drafts of all of its publications, all of its outlines, scripts, and email exchanged during its year-and-a-half-long investigation. PlanetAid also pursued a dozen discovery disputes in the district court. In granting the anti-slap motion, District Judge Maxine Chesney determined that PlanetAid and Ms. Thompson, who sued Reveal in her capacity as DAP's country director, were limited-purpose public figures. And I will talk about that in a second. Judge Chesney gave plaintiffs every benefit of the doubt. She considered all of plaintiffs' evidence, and she purposely excluded some of CIR's evidence. She also assumed, theoretically, for the purpose of deciding the anti-slap motion, that CIR's evidence was entirely false. But after months of consideration of plaintiffs' proffered evidence, no matter how speculative, Judge Chesney held that whether viewed separately or collectively, plaintiffs' evidence is insufficient to support, by clear and convincing evidence, a finding of actual malice. And on this record, it is not a close call. Plaintiffs' declarations were filed literally years after CIR's investigation ended and after plaintiffs repeatedly, again, declined to be interviewed. The declarations merely quibble around the edges about how many pumps or goats a particular village received or whether there might have been other individuals that CIR might have interviewed who might have had a different view of some of the facts. The Ninth Circuit routinely affirms district court dismissal of libel suits for lack of evidence of actual malice by granting an anti-slap motion or by granting summary judgment under Rule 56. And regardless of the dismissal standard that is applied, this court should affirm. I'd like to turn very briefly to the actual malice standard, because I think it will... Why don't you talk about the limited public purpose figure first? Sure. Because I go... Yes. With respect to Planet Aid... Fair. Yes, Judge Baird. That's fair. I'm having trouble hearing. Oh, I just suggested that he speak first about the issue of limited public purpose figures before he gets to the question of actual malice. Okay, thanks. Yeah, I can't hear you when you lean back. He said he can't hear you when you lean back. Oh, okay. I won't lean back anymore. Thank you for pointing that out. With respect to Planet Aid's public figure status, Judge Chesney specifically found that Planet Aid's use of charitable funds and plaintiff's ties to the teachers' group... This is the group founded by Mr. Pedersen, who was the subject of a years-long trial in Denmark. He was acquitted, but he then left quickly after the trial and has been living in exile ever since in Mexico, not being extradited. He's on Interpol's most wanted list. The connection between that and the teachers' group and Ms. Thompson is that Ms. Thompson testified at his trial. She had an opportunity to refute that. She didn't in her declaration filed in this case, which to me confirms in part her limited purpose public figure status. But Judge Chesney applied Makoff versus Trump, and she said specifically that Planet Aid's fundraising efforts in turn invited public attention, comment, and criticism about whether charitable funds were being properly used. In the briefing, and here, counsel argues that the relevant controversy is relevant to USDA, but that was too narrow, according to Judge Chesney, and that's the right decision. Judge Chesney specifically noted Planet Aid's extensive public campaign to raise funds, including the Boston Globe's reporting that Planet Aid raised $3.6 million in clothes in cash, telling the public that half of the clothes would be donated to the needy in Africa. She cited reporting in the Chicago Tribune. She cited reporting in the Los Angeles Times, reporting that Charity Watch calculated Planet Aid's spending to be about 29% on charity. Before CIR's reporting, Planet Aid publicly denied any improper use of funds or links to Peterson or the teachers group and continued its fundraising efforts. So in Judge Chesney's view, and I agree with it, that second element of Makoff was absolutely met. As to the third element, Planet Aid, before the allegedly defamatory statements were published, voluntarily thrust itself into the relevant public controversy through its massive solicitation efforts and public responses to reported criticisms about the organization. That's a direct quote from her opinion. Quote, such actions demonstrate Planet Aid did not unwittingly become the subject of publicity with respect to its charitable funds. Rather, it attempted to influence the public perception of that use. And I would refer you to the declaration that was submitted by Mr. Goad. He was the lead prosecutor in the Danish government's prosecution of Mr. Peterson for charity fraud. His declaration is found at ER 4773. His declaration specifically noted that Planet Aid and Lisbeth Thompson were specifically implicated in the trial. The declaration notes that the Danish prosecutors showed that Planet Aid's clothing operations were used to generate funds for the teachers group. As to Lisbeth Thompson, the district court properly held that... Is it your position then, counsel, that if Planet Aid and Thompson participated in the Danes' trial, they became injected into the issue? That is the connection to the teachers group, but that's not the basis for... That's not the only basis, Judge Bea. There are other articles that are detailed by Judge Chesney to what she relies on as to the pre-existing controversy, the fact that Planet Aid denied that and continued to solicit funds for charitable purposes to basically raise... And the denial of any bad doing by Planet Aid means it injects itself into the controversy? No, it wasn't just pure denial. It was the fact that it denied it and then it continued on in raising charitable funds through the selling of used clothes overseas in a way that was... Basically they just kept doing what they were doing. And Lisbeth Thompson continued to basically, as the public face of DAP, Ms. Thompson, Judge Chesney said, was more than simply involved in or associated with DAP Balawi's use of funds. The court cited before CIR published its findings, Ms. Thompson was regularly quoted in publications in Malawi. Those are attached to the Kandani Naguera Declaration, that's at ER 3990 through 4004. Judge Chesney relied on those numerous articles published in Malawi and elsewhere about DAP Balawi's alleged misuse of charitable funds and that Ms. Thompson had, quote, in response to public inquiries regarding the propriety of DAP Balawi's use of funds, not only publicly asserted those funds were being properly used, but also continued broadcasting its charitable achievements, satisfying the second make-off element. Critically, Ms. Thompson admits she made public appearances and spoke on behalf of DAP. She doesn't refute any of the dispositive facts that confirm her limited public figure status. And in particular, Judge Chesney also relies on the Declaration of Innocent Chitose, which is found at ER 3499. And I point that to the court's attention because he specifically talks about being directed by Ms. Thompson, he was, after all, the head of communications of public relations for DAP, to voluntarily, he was told by Ms. Thompson to voluntarily seek out public attention in Malawi for Ms. Thompson and DAP Balawi to use DAP Balawi's access to the press and public communications in responding to any negative communications about DAP Balawi or Ms. Thompson. And Ms. Thompson appearing at press conferences, public events, and online, again, as the face of DAP Balawi, appears throughout the record. There are citations I can give the court if it wants of her appearing there. And she, of course, does not deny that she testified as a defense witness in Mr. Pedersen's trial long, long ago. But even so, with respect to Ms. Thompson, I would highlight as well that the specific claims, factual claims that she makes separate from DAP Balawi are only at the First Amendment Complaint, paragraphs 197, 200, and 203. And she basically has a problem with the way in which she was asked a question. She denied that she was stealing money. She refused to be interviewed by Reveal. Reveal reported that verbatim. The readers had a chance to look at that, and by any measure, that's not libelous, let alone clear and convincing evidence of actual malice. I'd like to go back, if the court doesn't have any other questions, I'd like to go back to the next. Counsel. Yes. I have one question for you, if I may. Putting aside the specific facts here, what is the legal standard for when a limited public figure has thrust themselves into a controversy? When you mean by legal standard, I believe that under... What has the Supreme Court said, or what has our court said? They have to have thrust themselves into the vortex of a public controversy. And I believe that both Ms. Thompson individually and Planet Aid have done that by being connected with the charitable promotion and solicitation of millions of dollars of money from the public, despite the public being told, and despite there being a controversy, that those funds may not be going to charitable purposes. They responded to that, and yet they continued to raise charitable funds. That was exactly what was going on for decades before CIR ever did its reporting. I hope that answered your question. Yes, it does. Thank you. Under the actual malice standard, what matters is CIR's belief that the information reported about Planet Aid was true at the time of publication. Consistently, in their individually filed declarations and later under cross-examination by Mr. Rosenthal, during each of their depositions, CIR's reporters and editors unanimously stood by the truth of their reporting. In subtle First Amendment precedent recognizes the need for a vigorous and uninhibited press. The actual malice test and standard of Times v. Sullivan exists so that journalists doing important reporting work like CIR have the breathing space they need. At this point, it is critical with respect to the actual malice arguments to understand that under Anderson v. Liberty Lobby, where actual malice is required, the trial court must view the entire record to determine whether the plaintiff's evidence is of sufficient caliber or quality to allow a rational fact finder to find actual malice by clear and convincing evidence. And that's what Judge Chesney did not find. She did not find that there was malice and she did not find clear and convincing evidence of it. After Planet Aid conducted... Did she find that no reasonable juror could determine that there was clear and convincing evidence? She applied the Rule 56 standard and she determined, basically, that there was no clear and convincing evidence, that on a pretrial basis, it was not plausible. I have the highest respect for Judge Chesney with whom I served on the Superior Court. And the question is not whether she weighed the evidence to determine whether it was clear and convincing. The question is whether she determined that no reasonable juror could determine that it was clear and convincing. That's the issue I have. I believe she did, Your Honor. She doesn't say so explicitly. She did follow Rule 56 and Cites 256, she understood that under Planned Parenthood, she needed to review all of the evidence and we were specifically in the party's briefing. That was the test that she was asked to apply. Thank you, Your Honor. I would like to address, I'd be happy to address any of the points with respect to actual malice. The idea that there was direct evidence of malice, a lot of the things that Mr. Rosenthal were pointing to, rather than demonstrating actual malice, reflected cross-checking and the editorial process. That's not doubting the evidence. With respect to siphoning away, plaintiffs misrepresent that Reveal actually published what plaintiffs contend was siphoning $65 to $90 million in USDA funds. The overwhelming evidence supports the sting that PlanetAid was diverting funds, however, Reveal never stated that plaintiffs siphoned a particular amount of $65 to $90 million. There was a sidebar that was published. It's in the record that has, it's complete with graphs. Reveal explains how there was an inefficient process of grant allocation such that PlanetAid ultimately received two-thirds of that amount. So it's not that they ignored it, they actually had an entire sidebar, an entire article explaining how they came to the calculation. But part of the statements were that from 50 to 70% of $133 million from the Department of Agriculture had been siphoned away. If you do the mathematics, that is $66.5 to $93.1 million when they only received $70 million. So that's a flat-out error, right? No, Your Honor. In the May 2016 article, Reveal reported that U.S. taxpayers have granted more than $133 million and that insiders believe at least half of the donor funds meant for humanitarian projects was shuttled out of the country. In the radio program which followed the original publication or was, yeah, followed it, Reveal reported that money from USDA grants over $130 million up to 70% was allegedly taken from projects it was meant for and stripped away. That's based on Mr. Longway's estimate, but it's also based on others who collaborated his testimony. But 70% of $133 million is more than the $70 million that was allocated to the program. But that's also talking about funds. All of CIR's editors consistently stated that they believed the 50 to 70% range of money siphoned away was accurate. Reveal's editors didn't admit that they knew of no account being diverted to programs to Mozambique. To the contrary, at their depositions, when Mr. Rosenthal questioned, they uniformly testified they could not recall the exact amounts diverted in Mozambique because that country wasn't the focus. They were focused on Malawi. Counsel, let me ask you two short questions, if I may. Yes. One is, can malice still be shown by a reckless disregard of the truth? Can malice be shown by a reckless disregard of the truth? Yes. But that did not happen on this record. My second question was, if reckless disregard of the truth can be a governing standard, how is the application of that standard affected by the fact that the appellant's principals refused to submit to interviews with Reveal? Well, I'm not sure that I could point to a particular case, Judge Gould, but it is maddening to have to deal with allegations about how to calculate distributions and everything else when, and as they explain in their sidebar, they ask rhetorically, where did it go? How was it spent? It wasn't that they didn't address accountants. Accountants filed stated reports and the like. There's no question about that. But what their insiders told them, and there were several of them, there were nine different individuals that collaborated beyond Mr. Longway, collaborated the findings of financial abuse that CIR reported. But when they confronted and asked plaintiffs to address that, to answer the questions, to clear this up, they got silence. They had a press release from a press agent, and Ms. Thompson would not comment. And under any sort of application today of the actual malice standard, that doesn't give any breathing room. That means basically that they have to do the best they can. They have to have the scienter at the time. You know, this is what we know, and this record is meticulous as to what they sought to learn as to the truth, and the record is consistent as to what they believed the truth at the time they published. Thank you, counsel. Mr. Rosenthal, I have a question you might be able to help me with. Sure. It seems to me that the argument for the defendants is that if a charitable organization seeks funds for its purposes, and some reporter says that the fundraising is corrupt, that and charitable corporation or organization denies the corruption, that the charitable corporation has become a public figure, a limited public figure, by the simple fact of denying the corruption. And that doesn't seem quite right. It's not right according to the California Supreme Court in Kawar. It's not right according to the Second Circuit in Law Liberty. You can't be held to be a limited purpose public figure if all you do is simply come forward to defend your reputation. But I think that what Mr. Burke was saying was, yes, but after they were called corrupt, they kept doing what they were doing, and that makes them a public figure. It seems to me that if what they were doing was not corrupt, and they kept doing it after being accused of being corrupt and denying they were corrupt, that the continued doing it doesn't seem to me to make them corrupt. It certainly doesn't. But I'd like to point out in this case, the only thing that Planet Aid does to raise funds is it solicits used clothing. And so if all they were doing was continuing to solicit the public to deposit used clothing in these yellow bins and then monetize it, how in the world is that saying to the public, and by the way, we didn't steal $65 to $90 million, or 50 to 70% of $130 million? If all they did was continue on with fundraising, that just makes them like every other normal charity who engages in fundraising. The cases are clear, and I'd like to address Judge Gould's question, what is the test?  It's voluntarily thrusting yourself to the forefront of a particular controversy giving rise to defamation in order to change the outcome. Can it be said that Planet Aid intended to change the outcome of any controversy by soliciting recycled or discarded clothing? The answer to that question is no. Well, they tried to change the outcome of the controversy by denying the charges made. Well, the controversy, Your Honor, in this case, they defined themselves as being the use of USDA funds. That's got to be a pre-existing controversy, and they admit that there was no pre-existing controversy when the articles were published. So if that's the controversy, as they said it is, it can't satisfy the test in Gertz because it wasn't a pre-existing controversy. So what was the controversy? They say, well, the controversy was the trial of this individual, Omdi Peterson, and Ms. Thompson was implicated, and Planet Aid was implicated in that case. That is just false, and we urge the court to take a look at page 2408 of the record where Corso Jensen said one of the allegations is Planet Aid, Elizabeth Thompson, and Dap Malawi were specifically implicated in the trial of Omdi Peterson in several respects, cites the very declaration that Mr. Burke relied upon. Our declarant said this is completely false, and he actually relied upon the transcript and the prosecutor's summation. So it's not fair to say they were implicated, but let's assume, let's assume arguendo that Thompson did testify. Well, so did Mrs. Firestone in the divorce proceeding. That doesn't make one a limited public figure because they testified, but the fact of the matter is the allegation is flatly false. I see the red light is on. If I may have just a minute or two longer? One more minute. I would just like to say that the trial judge in this case did misunderstand the standard, and she said at page 3295, although some of the procedural standards are perhaps similar to a motion for summary judgment, the burden is a lot higher in these motions. That is just plainly not true. The burden is Rule 56. And for those reasons, this is a case in the heartland of defamation cases. It's a case in the heartland of Rule 56 cases. We're not at the margins. This is a case squarely about disputed issues of fact, and for that reason, we would ask the court to reverse the judgment of the district court. Thank you. Thank you, counsel. The case just argued will be submitted for decision. And I want to thank both counsel for their arguments today in the briefing, very helpful to the court. And we will be in recess for the afternoon.
judges: THOMAS, GOULD, BEA